## CITY OF GAINESVILLE v. BOARD OF CONTROL.

Circuit Court, Leon County.

August 10, 1954.

Lazonby, Dell, Graham & Mills, Gainesville, for plaintiff.

Richard W. Ervin, attorney general, for defendant.

HUGH M. TAYLOR, Circuit Judge.

The events leading to the present controversy began nearly 50 years ago with the enactment of chapter 5384, Laws of Florida, Acts of 1905, hereinafter referred to as the Buckman Act, the purpose of which was to remodel the state's higher education school system by eliminating a large number of small institutions (commonly referred to as academies) and establishing a smaller number of better equipped, staffed and financed institutions—among which was the University of Florida. A board of control was created, in conjunction with the state board of education, and given authority to select the location of the university. Naturally there was keen competition among a number of cities in the state to secure the location of the university in their respective communities. A group of Gainesville citizens, designating themselves a "citizens committee," made a written offer of various inducements for its location in that city—among which was an agreement to furnish free water to the university, without limitation as to time.

The offer was accepted and the university was located in Gainesville. The city of Gainesville, as distinguished from the "citizens committee," proceeded to perform most, if not all, of the obligations assumed by the committee. Certainly the city has recognized its obligation to and has continuously furnished the university with water, and until 1950 made no claim that the water should be paid for. Beginning in 1950 the city has contended the university should pay for the water it consumes, and has billed the university from time to time. The university has declined to pay the bills.

The purpose of the present suit is to determine the original validity and present enforceability of the contract as an obligation

of the city. It is not seriously contended that the original contract made in the name of the citizens committee was not either authorized by the city or ratified and adopted by the city as its obligation—such a position could hardly be sustained after the city has performed the contract for nearly half a century.

The city contends the contract is void because ultra vires the municipality. I cannot agree. While of course a city cannot be estopped to assert the invalidity of an ultra vires contract, the fact that the city officials for more than 40 years considered they were acting within the charter powers of the municipality, and the board of control, composed of high ranking public officials (many of whom were able lawyers) have regarded the contract as being within the powers of the municipality, should be strongly persuasive that the city did have power to make the contract. The city, as a corporation, has general powers to contract. No provision of the charter expressly excludes the power to make the contract in question. A careful reading of the Buckman Act clearly indicates the legislature recognized and, by necessary implication, approved the practice of municipal assistance granted to state institutions of higher learning as an inducement to the location of such institutions in the municipality. Provision was made for the reimbursement of several cities for contributions made as an inducement for the location there of one of the academies being discontinued if the municipality should not be chosen as a location for one of the institutions being established. Of particular interest in this connection is the following language from section 18 of the Act—

> And in case the City of Gainesville shall not be selected by the board as one of the places for the location of one of said institutions, then the Board of Education shall refund to the City of Gainesville out of the assets and property of the abolished institution located at such place, so much of the lands and property of the same, or its equivalent at its then value, as was donated to the state by the City of Gainesville.

This language strongly implies legislative recognition of the city's authority to make donations of this nature.

The wording of every section of the Act relating to the duties of the commission in locating the new institutions and the duties of the board of control in building them is such that it is hard to escape the conclusion that the legislature intended that the extent of local assistance to be offered as an inducement for the location of the institution should be taken into consideration, along with all other pertinent factors, in the selection of the most desirable sites for the new institutions.

Section 17 not only authorizes but affirmatively directs that among the factors to be taken into account in the location of the

university should be—"the funds and means at their command, or which may naturally come to the control of the said board of education for such purposes." Section 5 authorizes the board of control—"to receive donations." It is clear the Buckman Act contemplated that various cities and particularly the city of Gainesville should be permitted to offer *"funds and means"* as an inducement for the location there of the University of Florida, and that it was the board's duty to take the extent and nature of these funds and means into consideration in selecting the site for the university.

In the same session of the legislature at which the Buckman Act was adopted, another law, chapter 5498, was passed authorizing the city of Gainesville to issue unlimited bonds for "the purpose of securing educational advantages and facilities in or adjacent to such city." In Brown v. City of Lakeland, 54 So. 716, the Supreme Court recognized that the bond issue authorized by this statute was—"to contribute to the establishment or maintenance of an institution for higher educational purposes"—although it is not so stated in the statute (chapter 5498 does not expressly authorize the expenditure of the proceeds of the bond issue in assistance to the University of Florida or for any other purpose.)

While the high court's reference to the purpose and validity of chapter 5498 in the case cited is clearly obiter dicta, it is nevertheless indicated that the justices of the court recognized the well known fact that the purpose of the bond issue was *to assist in financing the university*, even though not so expressed in the Act. This fact, coupled with the further fact that neither chapter 5498 nor any other statute in express language authorized the expenditure of any funds by Gainesville in aid of the university (or for any other institution of higher learning) when considered with the action of the parties in entering into the contract here involved, shows that it was recognized by the legislature, the city, the board of control, the state board of education, and even the Supreme Court, that the city had authority by virtue of its charter or the Buckman Act to use public funds in aid of the university.

One of the reasons urged by the city for relief at this time is the assertion that the revenue produced by its waterworks is insufficient to pay for improvements which have been made in recent years. The contract in question was entered into during the operative life of chapter 5498, Acts of 1905, which provided for the construction of waterworks and the payment of the costs by the issuance of general obligation municipal bonds. The validity of the contract cannot, therefore, be measured by the financial productivity of the city utilities.

Nor is any public policy violated, even if the courts could recognize a public policy contrary to a practice so clearly endorsed by the legislature. The location of a state university in any city gives to the citizens of that community a great many very definite advantages. Citizens of that locality can attend the university while residing at home at a very substantial saving in living expenses. The business of the community is materially aided by the expenditure of large amounts of money, drawn from taxpayers throughout the state, in the construction and maintenance of buildings. The faculty and other personnel employed by a university become permanent citizens who are customers of the merchants and professional men and women located there. Real estate values are increased. Every student spends a large amount of money for board, lodging and amusements, and frequently for clothing, and, in these modern times, for automobiles, repairs, gasoline, radios, and many other items of merchandise. The court may take judicial notice of the fact that almost every business in a city receives direct or indirect benefit from the construction and maintenance of a modern university in or adjacent thereto.

Our municipalities today spend public money to maintain airports, golf courses, playgrounds, swimming pools, libraries, auditoriums and civic centers. The expenditure of public funds in assisting in the maintenance of a university is equally justified from a standpoint of public policy.

It is next contended that the contract, if originally valid, is without limitation as to its duration and should therefore be construed as a contract terminable at the will of either party or as a contract for a reasonable length of time—and, in the latter event, the court should declare that such reasonable period of time has elapsed and that the contract is no longer binding upon the parties. The argument is largely answered by Taylor v. Florida East Coast Ry. (Fla.), 45 So. 574. In my opinion to construe the contract as one terminable at the will of the city would destroy the very purpose of the agreement. Certainly the city did not intend to be in a position whereby it could secure the location of the university within its limits under a promise of free water—and as soon as construction had proceeded to the point where a relocation was impracticable terminate the obligation to perform its bargain, and thus enjoy the dance without paying the piper.

In addition to the holding in the case just cited, in my opinion even if the contract be construed as one effective for a reasonable length of time, it has not expired by the lapse of time. Cities are usually very permanent institutions. So are universities. It is the experience of mankind that both, when once firmly established, acquire a life measured in centuries rather than years. It could not

reasonably be argued that the plan of the Buckman Act was to provide an educational system for only a few decades. The city's contract should be construed in the light of the circumstances under which it was entered into, and it is obvious it intended to secure the location of a university that would exist for more than 50 years. Its obligation under its contract should be determined with this idea in mind. A reasonable length of time for the continuance of the contract must have some relation to the contemplated permanency of the relationship between the contracting parties. Applying these principles I am of the opinion that it has not been made to appear that the contract has become inoperative by the lapse of time. The city still enjoys the fruits of the contract—the presence of the university. Why should it cease to water the tree producing this fruit?

But, it is urged, a substantial change in circumstances has taken place so that a present condition exists which was not reasonably foreseeable and was not within the contemplation of the parties when the contract was entered into. If this be true and the changes *adversely* affect the city, equity might grant some relief and the changes might be given, consideration in determining whether or not a reasonable time for the continuance of the contract has elapsed. This argument, therefore, deserves consideration.

The change in circumstances pointed out is the rapid growth of the university from 135 students in 1905-06 to 11,709 students in 1949-50. Obviously all parties hoped and expected the university to grow and grow substantially. That the growth of the university, as well as the growth of the state as a whole, has vastly exceeded the dreams of most of those who, in 1905, were managing the affairs of the state and the city may be assumed—but I see nothing in this growth that *adversely* affects Gainesville. Of course, more water is needed to meet the demands of an expanded institution, but every element of benefit flowing to the city from its location there has grown in equal proportion, with the possible exception of the number of local citizens who are able to attend while remaining at home. But this has largely been accomplished by the fact that it is now co-educational.

Looking back over the history of the last 50 years, it is impossible for the writer to perceive how a fairer or more equitable means could have been arrived at to measure a contribution to be made by Gainesville toward the maintenance of the university in consideration for the benefits to be received by the municipality and its inhabitants from its presence there. As the number of students fluctuates, the demand for water fluctuates, upward or downward as the case may be. Every student gained increases the

demand for water—but that same student requires board, lodging, classroom accommodations and other facilities. He also spends his share of money with local citizens for clothing, amusements and luxuries. State appropriations for the university have kept pace with the growth of the student body and most of these funds are expended in Gainesville.

I am therefore of the opinion that the contract when made was valid and in accordance with accepted public policy, and that it has not expired or become inoperative by lapse of time. Whether or not under present concepts of the relative duties of the state and municipalities in the field of education, or other considerations, should incline the legislature to relieve the city from its obligation under this contract, is a matter as to which the courts should express no opinion.

It is considered, ordered, adjudged, declared and decreed—1. Defendants' motion for summary decree is granted. 2. The contract between the city of Gainesville and the board of control, described in the pleadings, is valid and presently binding on the parties.